UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DELISA HALE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) Cause No. 1:11-cv-277-WTL-DKL |
| SCOTT T. GANNON, *et al.*, | ) |
| | ) |
| Defendants. | ) |

### ENTRY ON DEFENDANTS'
### *DAUBERT* CHALLENGE TO EXPERT EVIDENCE

Before the Court is the Defendants' Motion to Exclude the Expert Testimony of Constance Brown (dkt. #42). The Court, being duly advised, now rules as follows.

### I.  STANDARD

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), established the standard for determining the admissibility of scientific evidence and the Federal Rules of Evidence were thereafter amended to reflect the law as set forth in *Daubert*. Federal Rule of Evidence 702 provides: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." In other words, the testimony must be relevant and reliable. *United States v. Allen*, 390 F.3d 944, 949 (7th Cir. 2004). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

In determining whether expert testimony is both relevant and reliable, courts employ a three-step analysis. *E.g.*, *Ervin v. Johnson & Johnson*, 492 F.3d 901, 904 (7th Cir. 2007). First, the witness must be qualified "as an expert by knowledge, skill, experience, training, or education." *Id.* Second, "the expert's reasoning and methodology underlying the testimony must be scientifically reliable." *Id.* Third, "the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.*

Several factors shed light on the reliability of an expert's reasoning and methodology: (1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known and potential rate for error; and (4) the "general acceptance" of the theory. *Bradley v. Brown*, 42 F.3d 434, 437 (7th Cir. 1994) (citing *Daubert*, 509 U.S. at 592-94). This is not a rigid test, however, as the applicability of these factors depends on the particular facts and circumstances of each case. *United States v. Cruz-Velasco*, 224 F.3d 654, 660 (7th Cir. 2000).

The *Daubert* "framework for assessing expert testimony is applicable to social science experts, just as it applies to experts in the hard sciences." *Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996). "The measure of intellectual rigor will vary by the field of expertise and the way of demonstrating expertise will also vary," but *Daubert* nevertheless applies. *Id.*

## II.    BACKGROUND

This action concerns an automobile accident that occurred on January 19, 2009, when the truck Plaintiff Delisa Hale was driving was struck by a truck driven by the Defendant Scott T. Gannon. The Plaintiff is alleged to have sustained permanent and severe injuries, including severe head injury, multiple orthopedic injuries, and brain injuries.

The Defendants stipulate that the accident was caused by the negligence of Defendant

Scott T. Gannon while acting in the course and scope of his employment with Defendant Annett Holdings, Inc., d/b/a TMC Transportation, Inc. The Defendants also stipulate that the Plaintiff was injured and incurred medical treatment as a result of the accident. However, the Defendants dispute the nature and extent of the Plaintiff's injuries.

One of the Plaintiff's proffered experts regarding her damages is Constance Brown, a certified life care planner and rehabilitation counselor. Brown reviewed the Plaintiff's medical records, interviewed the Plaintiff, sent questionnaires to the Plaintiff's doctors, and thereafter composed a "life care plan." The life care plan sets forth anticipated future medical treatment and care the Plaintiff will require over the course of her life and provides a present-day monetary calculation of the cost of those treatments and care.

The Defendants filed a motion to exclude the testimony of Constance Brown under Federal Rules of Evidence 702 and 703. A hearing on the matter was held on August 28, 2012, during which Brown testified about her qualifications and her analysis of the Plaintiff's life care needs.

### III.  DISCUSSION

The Defendants' objections are many. With respect to Brown's analysis of the Plaintiff's future medical needs, the Defendants contend that Brown's testimony violates Federal Rule of 702 because (1) Brown's life care plan is not based on any reliable scientific method; and (2) Brown does not base her opinions on recommendations actually found in the medical records, instead impermissibly relying on her own medical opinions regarding future treatments. The Defendants also contend that Brown's life care plan violates Federal Rule of Evidence 703 because Brown impermissibly bases some of her opinions on questionnaires she sent to the Plaintiff's treating physicians.

With respect to Brown's vocational analysis, the Defendants argue that (1) Brown's report

3

is devoid of any scientific analysis; and (2) Brown's report is inconsistent with information provided during discovery with respect to the Plaintiff's current work status.

The Court addresses the Defendants' objections below; however, it is the Plaintiff's burden to show that her proposed expert testimony meets the *Daubert* standard. Therefore, the Court begins by addressing each prong of the *Daubert* standard itself.

### A. Qualifications

The Defendants concede that Brown is qualified as a life care planner and vocational assessor, and the Court finds no reason to disagree.

Constance Brown is a certified life care planner, certified rehabilitation counselor, and certified case manager. Brown has an undergraduate degree in sociology from Indiana University and a master's degree in rehabilitation administration and services from Southern Illinois University. Brown has practiced vocational rehabilitation since 1977 and has been certified in life care planning since 2003. As a vocational rehabilitation counselor, Brown testifies regarding vocational capabilities in 60 to 90 Social Security disability hearings per month.

Brown testified that life care planners have a background (usually a graduate degree) in rehabilitation or a medical or allied medical degree. In order to become certified as a life care planner, prospective planners must complete at least forty hours of post-graduate instruction and training. Maintaining a life care planner certification also requires 100 hours of continuing education credits, including 20 hours of ethics credits, every three years.

Given Brown's education and training, the Court finds that Brown is qualified as an expert in her respective fields.

### B. Methodology

The Defendants take issue with Brown's methodology, asserting that the way in which she

actually composed her life care plan is not scientifically reliable.

*1. Future Needs Analysis*

At the hearing, Brown testified to the life care planning methodology for analyzing a client's future medical needs as prescribed by the International Association of Life Care Planners ("IALCP") and outlined in a life care planning and case management handbook. She explained that she was taught this method during the certification process. It is important to note at the outset that a life care planner relies on the opinions of appropriately credentialed individuals to provide identification of treatment and its duration. The first step in composing a life care plan requires gathering and reviewing all relevant information, including the complete medical records of the client, depositions and interrogatories of the client's doctors, and day-in-the-life videos. A life care planner will also interview the client, her family, and her medical care providers. At the second step, the life care planner then identifies any remaining "holes" in the data and, if needed, follows-up with the client or her medical care providers to gain additional information. Once satisfied that all relevant information has been gathered, at the third step the life care planner "costs-out" the anticipated medical treatment and care indicated by the life care planner's research. A life care planner is not an economist, however, and therefore she indicates the costs of the treatment and care in present-day figures. The actual figure indicated for a specific procedure is unique to the client's geographical area and may be derived from billing records or internet research.

In theory, the Court finds life care planning methodology, appropriately limited to gathering and costing-out doctor-recommended future medical treatment, scientifically reliable.

However, the Defendants also take issue with how Brown actually applied the methodology when she composed the Plaintiff's life care plan. Specifically, the Defendants assert

that Brown (1) offered her own recommendations as to treatment rather than rely on doctors' recommendations and (2) impermissibly filled in the "holes" in the Plaintiff's future treatment requirements by sending leading questionnaires to the Plaintiff's doctors.

With respect to the Defendant's first objection, the Court agrees that treatment included in Brown's life care plan that is not supported by a doctor's recommendation is not scientifically reliable. Brown repeatedly testified that the treatment she includes in a life care plan must be prescribed by a medical doctor, as she is not qualified to prescribe medical treatment. Accordingly, the Court finds that the following portions of Brown's testimony should be excluded, as her testimony revealed that these items were derived in a way that deviates from the appropriate life care planning methodology:[1]

1. *Cognitive Rehabilitation* (number 4 on page 5 of 11). Dr. Jeffries recommended cognitive rehabilitation in the form of "talk" therapy in order to restructure the Plaintiff's thought patterns, but Brown testified that *she* "was looking for" rehabilitation related to memory, concentration, and focus. Brown also testified that there was no actual prescription for cognitive rehabilitation in Dr. Trexler's medical records.

2. *Gabapentin, Nabumetone, Glucosamine, and Aleve* (numbers 5 and 6 on page 8 of 11; numbers 7 and 8 on page 9 of 11). Brown testified she based her inclusion of these prescriptions on the Plaintiff's report during the life care planning interview that she taking this medication.[2]

---

[1] In the Plaintiff's pre-*Daubert* submission to the Court, the Plaintiff represents that the following items will be redacted from the life care plan presented at trial: the otolaryngologist, the binaural amplification, the audiogram, and physical therapy for pain treatment. Pl.'s Pre-*Daubert* Submission at 4, dkt. #90. Therefore, the Court does not address these items.

[2] The Court notes that the Plaintiff mentions elsewhere that some of these prescriptions

3.  ***Orthopedic follow-up*** (number 2 on page 10 of 11). Brown testified that she included an orthopedic follow-up based on her prior experience with other knee replacement patients, not on any doctor's recommendation.

4.  ***Trigger point injections*** (number 3 on page 10 of 11). Trigger point injections were prescribed by Dr. Ward in conjunction with physical therapy, but the Plaintiff has represented that she will redact physical therapy from her life care plan. There does not appear to be any doctor-recommended basis for trigger point injections as an independent treatment.[3]

Brown also testified that she recommended a vocational rehabilitation evaluation. Given Brown's qualifications as a vocational rehabilitation counselor, the Court finds that her recommendation of this treatment is scientifically reliable.[4]

### 2.   *Vocational Analysis*

Brown also testified regarding the methodology used for conducting a vocational analysis. Applicants for vocational rehabilitation certification are instructed in this methodology and it is explained in a rehabilitation consultant's handbook. Vocational rehabilitation counselors compose a vocational assessment by reviewing medical records and identifying the client's functional

---

were indicated in her medical records. However, Brown did not testify that she based her inclusion of these items on those records.

[3] In addition, even if the Plaintiff does not redact physical therapy from the life care plan, the Plaintiff may not be able to prove the recommendation of therapy and trigger point injections by admissible evidence if the only basis for the recommendation of treatment is the questionnaire. See Part C. below. However, the Plaintiff indicated in her Pre-*Daubert* submission that the trigger point injections may be indicated in Dr. Jones' medical report summary, although this does not match up to the life care plan, which attributes the recommendation of trigger point injections to Dr. Ward. At this time, the Court expresses no opinion on the admissibility of Dr. Jones' report.

[4] The Court notes Brown's testimony that no ethical problem arises from her recommendation, as she will not do the actual evaluation herself.

limitations. The counselor interviews the client about her current work or work history and compares the jobs the client has had in the past with the jobs the client can safely do now, given her functional limitations. A life expectancy based on peer-reviewed journal articles is assigned to the client, and information from the U.S. Department of Labor about health insurance, life insurance, and other employment benefits is added to the analysis. Brown explained that the plan is "dynamic" in the sense that it will change as new information is discovered or the individual's situation changes.

Once again, the Court finds that the methodology Brown articulated is scientifically reliable. However, the Defendants again object to Brown's application of the theory. The Defendants' principal objection is that Brown does not support her citation of certain statistics with scientific support. However, that is simply not true.

With respect to her specific vocational analysis regarding the Plaintiff, Brown testified that she derived the Plaintiff's functional limitations from medical records. She then applied the light work limitations from the Dictionary of Occupational Titles. She used data from the Bureau of Labor Statistics to determine the yearly wages for a job with the Plaintiff's functional limitations and she derived the Plaintiff's work-life expectancy from a scientific report published in the *Litigation Economics Review*. Brown testified that her earning calculations were based on total-offset methodology, a measure of economic calculation that accounts for inflation and cost of living increases. Each of these sources of data was cited in Brown's written report. For these reasons, the Court finds that Brown's application of the approved vocational analysis methodology is also scientifically reliable.

The Defendants also object to Brown's vocational analysis because, they assert, the jobs Brown limits the Plaintiff to performing are lighter in workload than the job she is currently

performing at the BMV. This point goes more toward the helpfulness of Brown's analysis to the trier of fact than it does to her methodology and it will be addressed in that context below.

### C.     Relevance

With respect to the third prong, the Plaintiff must demonstrate that the proffered testimony will assist the trier of fact. In this case, liability is generally accepted, and damages are the key issue. A life care plan assigning a monetary value to medical treatments prescribed for the Plaintiff obviously aides the trier of fact with respect to one determination it must make: the amount of damages. However, there is a significant hurdle to the helpfulness of the life care plan – namely, the prerequisite proof of treatment. If the underlying treatments are not proved by independent admissible evidence, then Brown's projected cost of treatment is irrelevant.

With respect to each item of treatment listed on Brown's plan, the Plaintiff must prove the necessity of treatment to the usual standard and by admissible evidence. At this stage, the Plaintiff has indicated that Drs. Trexler, Jeffries, Fisher, and Jones will testify at the trial, and their testimony will presumably include the necessity of future treatments attributed to them in Brown's life care plan. However, Brown has attributed certain treatments – psychiatrist visits and trigger point injections – to Drs. Mishra and Ward, who are not expected to testify at trial. Rather, the Plaintiff has indicated that these recommendations of treatment are found in the questionnaires that Brown submitted to the doctors for follow-up.[5] However, the Plaintiff has provided no basis for the admissibility of the questionnaires.[6] Unless they are admitted into evidence or a proper

---

[5] The Plaintiff has represented that the prescription medication recommendations are found in Dr. Mishra's medical records, not the questionnaire.

[6] A point of clarification is necessary here. The Defendants also object to Brown's testimony because, they assert, she may not rely on inadmissible questionnaires as a basis for including certain treatment in her life care plan. However, the Defendants conflate the standard for

9

foundation for the necessity of treatment is otherwise laid, there will be no basis for the jury to find that the Plaintiff will need the treatments; therefore there will be no basis for Brown to testify about related costs. Accordingly, absent proof of the recommendation of these treatments by admissible evidence, the following treatments must be excluded from Brown's life care plan:

1.   *Psychiatrist* (number 3 on page 4 of 11), attributed to Dr. Mishra.

2.   *Trigger point injections* (number 3 on page 10 of 11), attributed to Dr. Ward.

Furthermore, there are a number of prescriptions that are of questionable relevance for another reason: Brown testified at the hearing that she did not attempt to separate prescriptions that may have related to impairments existing before the accident from those existing after the accident. The Court is mindful that Brown is not qualified to make that determination; however, this fact nevertheless bears on the helpfulness of the plan. If the plan includes prescriptions for items the Plaintiff would have otherwise incurred, then it does not help the trier determine the measure of damages attributed to the accident. For this reason, at this time, the Court finds that the following items must also be excluded from Brown's plan and testimony:

---

evidence on which the *jury* may rely to find that certain treatment is necessary with the standard for evidence on which a *life care planner* may rely to include in her life care plan. Federal Rule of Evidence 703 provides: "An expert may base an opinion on facts or data in the case that the expert has been made aware of . . . . If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Brown testified that one of the step-by-step procedures outlined in the life care planning handbook for following-up with treating physicians is composing a letter outlining the "right" questions to assure that the planner is soliciting the needed information. Furthermore, all parties agree Brown may not render medical treatment opinions herself. Therefore the Court finds that submitting questionnaires to treating physicians requesting additional information is a reasonable practice. *See also Dan Cristiani Excavating Co., Inc., v. Money*, 941 N.E.2d 1072 (life care planner's reliance on otherwise inadmissible physician recommendations was permissible). While the Defendants argue that Brown's questionnaires impermissibly lead the treating physicians into recommending treatment that Brown thinks is appropriate, the Court will not assume that a properly trained medical doctor could be so easily led into making unnecessary treatment recommendations.

1. *Ambien, Effexor, and Xanax XR* (numbers 1, 2, and 3 on page 7 of 11).

2. *Xanax, Gabapentin, and Nabumetone* (numbers 4, 5, and 6 on page 8 of 11).

3. *Glucosamine and Aleve* (numbers 7 and 8 on page 9 of 11).

With respect to Brown's vocational analysis, the Defendants argue that any assistance Brown's testimony will offer the trier of fact is outweighed by the risk of confusion. Specifically, Brown limits the Plaintiff's future work options to jobs with a lighter exertional level than the job she currently performs at the BMV. However, the Court finds that this fact goes more to the weight the trier should assign Brown's testimony than its admissibility. At the hearing, Brown explained that her vocational assessment is based on her understanding of the Plaintiff's limitations as the Plaintiff reported them to her. Brown then opined that, given these limitations, the Plaintiff would not be able to maintain her current job for much longer. This testimony would dispel any confusion that could be wrought, while at the same time affording the jury the opportunity to assess its weight, given the Plaintiff's current employment at the BMV.

### IV. CONCLUSION

For the foregoing reasons, the Defendants' motion to exclude the testimony of Constance Brown is granted in part and denied in part as follows: The Defendants' motion is **GRANTED** as to Brown's testimony regarding the items enumerated above. The Defendant's motion is **DENIED** as to all other proffered testimony documented in Brown's expert report.

The Court notes that this entry is not a final ruling regarding the admissibility of the evidence at issue. Rather, it simply prohibits any party from eliciting testimony regarding or otherwise mentioning a particular issue during trial without first seeking leave of Court outside of the presence of the jury. Therefore, a party who wishes to elicit testimony or introduce evidence regarding a topic covered by this entry should request a sidebar conference during the appropriate

point in the trial, at which time the Court will determine how best to proceed. Parties should always err on the side of caution and interpret this ruling broadly, requesting sidebars before eliciting testimony or offering evidence that is even arguably covered by this ruling and avoiding mention of such topics during voir dire, opening statements, and closing argument.

SO ORDERED:   09/05/2012

_William T Lawrence_
Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.